In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00171-CV**
_____

**IN THE INTEREST OF H.M.R.J.**

**On Appeal from the County Court at Law**
**Orange County, Texas**
**Trial Cause No. C210006-D**

**MEMORANDUM OPINION**

Following a bench trial, the trial court found: (1) that Mother endangered H.M.R.J., her then fifteen-month-old daughter and the subject of this suit; (2) that Mother failed to comply with the trial court's order specifying the actions Mother was required to take before the trial court would require the [Department] to return the child to Mother; and (3) that terminating Mother's parent-child relationship with H.M.R.J. is in H.M.R.J.'s best interest.[1] Relying on these findings, the trial court

_____

[1]Tex. Fam. Code Ann. § 161.001(b)(1)(E), (O), (b)(2).

signed a judgment terminating Mother's relationship with H.M.R.J.[2] Mother timely appealed from the judgment. In three issues, Mother argues the evidence is insufficient to support the trial court's findings terminating her relationship with H.M.R.J., whom we will call *Sara* in the appeal.[3] But we conclude the evidence is legally and factually sufficient to support the trial court's findings for the reasons explained below. So we will affirm.

## Background

Before addressing Mother's arguments as she presents them in her brief, we discuss the background that led to the Department filing the case and the trial. In our discussion, however, the evidence is presented in the light favoring the trial court's findings.[4] To begin, we start with the Department's suit to terminate Mother's parent-child relationship

---

[2]The trial court also terminated Father's parent-child relationship with H.M.R.J. after Father signed an affidavit of relinquishment. Father did not appeal from the trial court's order.

[3]We use pseudonyms for the names of the minor and members of her family to protect Sara's identity. Tex. R. App. P. 9.8 (allowing courts to protect the identities of minors in parental-rights termination cases). We further note the Department sued Father in this suit, and the trial court terminated his relationship with Sara. Father, however, did not appeal.

[4]*In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

with Sara, filed in January 2021. The petition is supported by an affidavit signed by Kaitlin Clark, an investigator employed by the Department. Clark's affidavit states that the day after Sara was born, the Department received a report alleging Mother was neglectful in supervising Sara.

In her affidavit, Clark describes that Mother and Father have an extensive history with the Department, which dates to 2013. When the Department sued and asked the court to place Sara in its custody, Mother had already been involved with the Department in cases arising from her neglectful care of her first three children. These earlier cases were resolved in 2018, when Mother signed affidavits and voluntarily relinquished her parental rights to these children when the trial court signed orders terminating Mother's rights to them. When the trial court terminated Mother's rights to her other children in 2018, Mother's other children were then ten, four, and one-year old. That said, evidence of how Mother cared for her first three children is evidence the trial court heard and could consider as relevant to how Mother would care for Sara if Sara were to be returned to her should Mother's past patterns of conduct continue.

Mother's history of neglect caring for her children is tied to her history with issues involving her mental health combined with a history of her use of illicit drugs. Clark's affidavit revealed that when the Department learned of Sara's birth, it was aware of Mother's pre-existing history tied to her use of synthetic marijuana, negligent supervision of her other children, and her failure to provide her other children a suitable, safe place to live.

Based on the allegations in the Department petition and Clark's supporting affidavit, the trial court named the Department as Sara's temporary managing conservator. When the hospital discharged Sara, the Department placed her in foster care. In a subsequent adversarial hearing, the trial court ordered Mother to comply with the requirements of a family service plan. Under the plan, the Department's initial goal was to reunite Sara with her mother. The initial plan the Department filed with the trial court—a plan dated February 2021—required Mother to complete several tasks. Among other requirements, the tasks the trial court ordered Mother to complete included: (1) maintaining a safe, stable, and appropriate home environment free from illegal drugs and violence, (2) attending and completing a drug and alcohol assessment, (3)

submitting to alcohol and drug assessments, and (4) participating in and completing a mental health assessment to address her mental health. By May 2021, however, the Department changed the primary goal of the family service plan from family reunification to unrelated adoption.

The trial court called the case to trial in May 2022. Nine witnesses testified in the trial: (1) Mother; (2) the Department's investigator, Kaitlin Clark; (3) a psychologist, Dr. Nisha Amin; (4) a Child Protective Services caseworker assigned to Sara's case between September 2021 and December 2021, Randi Frazee; (5) a licensed professional counselor who saw Mother in counseling, Ann Williams; (6) the Child Protective Services caseworker assigned to Sara's case as of April 2021, Beth Green; (7) the CASA volunteer in Sara's case, who testified that, in her opinion, it was in Sara's best interest for the court to terminate Mother's and Father's parental rights; (8) one of Sara's foster parents, who described Sara's medical problems, how those problems were being addressed while Sara was in foster care, what a typical day of Sara's life was like in the foster home, and that Sara's foster parents wanted the trial court to terminate Mother's and Father's rights so they could adopt Sara; and (9) Sara's other foster parent, who gave similar testimony.

In general, the evidence in the trial shows that around 30 weeks into Mother's pregnancy, or about seven weeks before Sara was fully developed, Sara was born. At birth, Sara weighed less than 3 pounds. Sara couldn't breathe or feed without assistance when she was born. Along with those problems, Sara was diagnosed with having a hole in her heart. Sara remained hospitalized for two months before she was discharged.

In January 2021, the Department sued Mother and Father and asked the trial court to remove Sara from her parents' custody and name the Department as Sara's temporary sole managing conservator. In the suit, the Department sought to reunify Sara with her parents. But the Department also alleged that if reunification was not possible, it requested that the court terminate Sarah's relationship with her parents.

The affidavit Clark signed to support the Department's petition for removal was admitted without objection in the trial. Her affidavit includes evidence addressing deficiencies in Mother's ability to properly supervise and provide Sara with a safe home. For instance, Clark's affidavit reveals that between 2013 and 2016, the Department required Mother to complete services with the Department to improve her

parenting skills on three separate occasions after the Department determined that Mother's use of synthetic marijuana combined with the conditions Mother and her children were living in were dangerous to Mother's first three children, yet Mother didn't correct these problems, and instead she chose to voluntarily relinquish her rights. Clark's affidavit shows that Mother attended family-based-safety programs in 2015 and 2016. Still, even after attending these classes and completing these programs, Mother's first two children—both girls, one age six and the other not yet three-years old—were found beside a feeder road next to an interstate highway without an adult. Clark's affidavit goes on to state that in 2017, these same two children told an adult that Father (who is the stepfather to Mother's first two children) had sexually abused them. They also claimed that Mother knew they were being abused. So in 2017, the Department filed suit to terminate Mother's parental rights to these two girls, their biological father's rights to them, and then later filed a suit to terminate Mother's parental rights to Mother's and Father's son, who in 2017 when the suit was filed was not yet one year old. As previously mentioned, Mother resolved these cases by signing affidavits

voluntarily relinquishing her rights. Father resolved the case involving his son by signing an affidavit voluntarily relinquishing his rights.

The trial court also heard testimony that shortly after Sara was born, Mother told an investigator in a meeting that Mother "denied any drug use." Mother also told the investigator she spoke to that she was not currently being treated for any conditions related to her mental health, and that she had discontinued medications she used for the mental condition after learning she was pregnant. But that was not the only evidence admitted in the trial relevant to whether Mother used drugs while pregnant with Sara. The trial court saw a report during the trial that in June 2021, Mother told a psychologist she had abused "drugs for eleven years on and off[,] but stated she has been sober for one year as of May 28, 2020." Mother told the same psychologist she was diagnosed by a mental health professional she saw when she was sixteen "with bipolar disorder, schizophrenia, depression and anxiety[,]" but "[s]he has not seen one since." The report was admitted into evidence during the trial.

Given Mother's history with the Department, the Department asked Mother to submit to further drug testing. Drug screens performed on hair and urine samples Mother submitted in response to the

Department's request were negative. Still, the Department questioned whether Mother was still using synthetic marijuana because it is difficult according to the Department's investigators to detect synthetic marijuana on tests. The Department's investigators also continued to question Mother's ability to safely care for a child given her history with the Department.

As for Mother's home, Mother told the investigator she spoke to at the hospital that the house where she planned to take Sara was "not ready, as there is no electrical wiring in the home." In January 2021, Clark went to Mother's home to assess its condition. At trial, Clark described what she discovered:

> There was a lack of electricity and plumbing in the home. There were soft spots on the floor where I was told not to walk for fear of falling through the floor. There w[ere] choking hazards throughout the home; uncleanliness. There was a large dog in the home. There was garbage in areas where garbage should not be. There were a multitude of safety concerns in the home.

Clark took photographs, and the photos were admitted into evidence in the trial. According to Clark, the conditions she found in Mother's home in the inspection were like those the Department found when the

Department had investigated Mother's other cases, cases that ended with orders terminating Mother's parental rights to her other children.

The trial court also heard evidence that were Sara to be returned to Mother's custody, Father (who had been accused by Mother's first two children of sexual abuse) might have access to Sara, as Mother and Father were still married. Mother denied that she and Father still had a relationship, but she didn't deny they were still married. She explained she had not gotten a divorce because she didn't have money to get one. Beth Green—a Child Protective Services caseworker who worked on Sara's case for about three months—testified that Mother doesn't "seem to understand the concern" created by the choices Mother has made more than once to live with men who have a history of sexually abusing children.

The trial court also considered the reports and the testimony of several expert witnesses in the trial. Dr. Amin, a psychologist, was the Department's primary expert. She testified that she assessed Mother in 2015 after the Department took Mother's children into custody from her that year. The trial court admitted Dr. Amin's 2015 report into evidence during the trial. In 2015, Dr. Amin's diagnostic impressions of Mother

included bipolar I disorder, attention-deficit/hyperactivity disorder, generalized anxiety disorder, substance use disorder (severe in remission as self-reported), alcohol use disorder (moderate in remission as self-reported), cannabis use disorder (severe in remission as self-reported), and dependent personality disorder with schizoid personality features. In her 2015 report, Dr. Amin recommended that Mother "will need to ascertain a sponsor and develop a structured regimen which will foster a sober lifestyle through further education and counseling." The report also notes that Mother "admittedly has not been consistent with treatment in the past (and admittedly would not have sought out the treatment on her accord, given her self-medication through drug and alcohol abuse) and therefore on-going psychiatric treatment will be crucial." Dr. Amin recommended "psychopharmacological intervention[,]" and she noted Mother "has a limited understanding of how drug and alcohol abuse impacts children and the family system short and long-term[.]"

During the trial, Dr. Amin explained she reviewed her report and the report of Dr. Meier. Dr. Amin testified she didn't find "much of an inconsistency" between the findings she included in the 2015 report and what Dr. Meir included in the report he prepared after he saw and

evaluated Mother in 2021. And Dr. Amin testified that, based on her 2015 and his 2021 report, it didn't appear that Mother, between 2015 and 2021, had adequately addressed the mental health issues she had identified in her 2015 report. According to Dr. Amin, that's because "Mother doesn't recognize her own mental health problems, so she ha[s]n't seen a psychiatrist." And Dr. Amin explained that if Mother's past patterns of behavior remain constant and continue to prevent her from addressing her psychological issues, a problem exists with Mother's "ability to be an effective parent." Relying on what Mother reported to Dr. Meier about when she quit using drugs, Dr. Amin testified that Mother used illicit drugs when she was pregnant with Sara. According to Dr. Amin, Mother's use of drugs in the pregnancy "endangered the physical or emotional wellbeing of that child." Dr. Amin also testified she doesn't believe Mother has the ability to effectively parent Sara to age 18.

Dr. Robert Meier, a psychologist who evaluated Mother in June 2021, didn't testify in the trial. The Department, however, offered and the trial court admitted Dr. Meier's six-page report of the psychological evaluation he prepared after seeing and testing Mother in 2021. Dr.

Meier's report reflects Mother told him she has a history of "abusing drugs for eleven years on and off[,]" but that "she has been sober for one year as of May 28, 2020." Based on Mother's history, Dr. Meier reported that Mother has a history of using marijuana, synthetic marijuana, and amphetamines. Mother also told Dr. Meier that when she was sixteen, she saw a mental health professional, who diagnosed her with "bipolar disorder, schizophrenia, depression and anxiety." However, she also told Dr. Meier she had not seen another mental health professional since she was sixteen. Dr. Meier diagnosed Mother with obsessive compulsive disorder and anxiety, with considerations that include somatization disorder, somatic pain disorder, hypochondriasis, dissociative disorder, and personality disorder. He recommended that Mother be referred to a psychiatrist and evaluated for psychotropic medications.

Georgia Williams, a licensed professional counselor who saw Mother several times between June and September 2021, also testified in the trial. Williams testified that Mother told her that her drug of choice was synthetic marijuana, but she also told her that she had "used meth for the prior year." According to what Mother to Williams, Father in the summer of 2021 was "living on the street and still using drugs[.]" And

even though Williams reported that Mother was attending substance abuse meetings online, Williams testified that Mother minimized her addiction in their meetings, as Mother "seemed to just not understand the seriousness of [ ] staying clean." Williams said that when she last saw Mother in September 2021, Mother had still not gotten a sponsor in her drug support group. Williams explained Mother didn't demonstrate a seriousness about her addiction when she was in counseling, nor did Mother exhibit an ability to maintain a stable job.

The CASA assigned to Sara's case testified she didn't think Sara's current living arrangements with her foster parents "could get any better." The CASA further testified it wasn't in Sara's best interest to remove Sara from her foster home. And the CASA testified no concerns existed about the foster home based on the CASA's visits there, as Sara is "getting everything she needs" in the home.

The CASA also described what she saw when she went to Mother's home in December 2021. According to the CASA, she "was bitten by flees upon arriving there." In the room where Sara was to live, the CASA said, "there was a rat situation, so [Mother] just closed the door because she couldn't seem to get rid of it." The CASA testified you could see through

14

the vent on the floor "down to the ground" in the bedroom where Mother said Sara would live. The CASA also described concerns with the flooring in the bedroom, explaining she was concerned with its condition because it looked as if "there was something crawling through it." The CASA testified that in April 2022, she made an unannounced visit to Mother's home to "see how [Mother] lives on a regular basis." Mother was not home. But the CASA testified the outside of the home showed "a lot of deterioration[.]" There were bags of trash stored under the house, insulation hanging from the house on both sides, a broken window, and grass around the house growing up to three feet high. The CASA sent Mother a text, explaining she was waiting for her. The CASA testified she waited for Mother for hours, but Mother didn't come home before the CASA gave up.

Mother is the only witness her attorney called to present Mother's defense. When she testified, she denied using drugs while she was pregnant with Sara. She said this case is different than the ones involving her other children because unlike what she did then, she "bent over backwards to complete [her] services" this time and had done all she could financially and physically do to fix her home to provide Sara an

appropriate place to live. Mother testified the utility services are now hooked up to her home. She said she has had electrical power there since April 2021. Mother also denied she was planning to bring Sara home from the hospital to the home inspected by the Department and the CASA. Instead, she said she was planning to take Sara to her mother and her grandmother's home, a home she described as a "stone throw away from [her] home." Mother was cross-examined about her plans for Sara if the court returned Sara to her. Mother responded:

> A.      My daily plan for my daughter? What, wake up in the morning, have breakfast, or I mean?
> Q.      . . . So what is your daily plan for her? Have you thought about it? What is it?
> A.      For her to be a kid.

Then when Mother's attorney asked her what her daily plan for Sara was throughout the day, she said:

> A.      Wake up in the morning, of course early because I wake up early every day; breakfast, and if she's in daycare take her to daycare, but if she's not in daycare we would play for a little bit. If she's not walking yet, maybe teach her how to walk a little bit and work on that. I like to read to her because she likes to sit there and help me turn the pages, which is the most adorable thing ever. Maybe nap time, wake up and have a snack, or maybe even a snack before nap time; depends on how cranky she is. And then when she gets up, do it all over again. Bath time and bed.

Mother also addressed the progress she said she had made handling her addiction since Sara's birth. She claimed that recently, she had obtained a sponsor in her Narcotics Anonymous group. Mother also claimed to have recently seen a psychiatrist. But Mother didn't say whom the psychiatrist she saw was, and she didn't introduce the psychiatrist's records or the psychiatrist's bill as evidence in the trial. According to Mother, the psychiatrist did not prescribe any medications in the visit.[5]

Mother also testified that several months before the trial, she obtained counseling with another licensed professional counselor, Virginia Manning. Mother testified that Manning "made [her] see what I was doing wrong and helped me fix myself so I can be a better person for my daughter." The Department offered and the trial court admitted Manning's records into evidence in the trial. They show Mother saw Manning six times, ending in February 2022. According to Manning's last report, Mother made "progress on treatment plan goals and objectives[,]" which were (1) stabilizing and reducing presenting symptoms, (2) improving symptoms of depression, stress, and anxiety, (3) reducing

---

[5]Mother also didn't put any medical records into evidence, including the records of a psychiatrist or any pharmacies.

unhealthy interpersonal relationships, and (4) developing healthy decision-making skills. Mother testified she had completed parenting classes and attended virtual Narcotics Anonymous and Alcoholics Anonymous meetings, describing them as positive. That said, Mother testified she was still working on her first step of a twelve-step recovery program in Narcotics Anonymous, which Mother described as the step that involved realizing "why you were an addict and how."

Mother described the jobs she's held since Sara was born and how she has managed to pay her bills. According to Mother, she has been current on her bills for the past year.[6] All of the jobs Mother described were short term. Mother worked cleaning houses, as a delivery driver, and at call centers. Mother also testified she makes money by selling her plasma as much as two times a week.

Mother described her decision-making skills as better now than when Sara was born. She explained she would be willing to complete more services with Manning, should the court consider a monitored return in lieu of terminating her right to Sara. Mother testified she now

---

[6]Mother didn't produce any documents to support her testimony that she had been employed.

has a sense of self-respect, which she didn't have before she went to

counseling. Mother explained:

> It's things that I didn't ever really pay attention to before, but
> in my defense[,] I was in a very bad addiction when I picked
> my paramours before, and that was just - - My relationships
> were devastating because I didn't pay attention. I didn't have
> self-worth back then, self-respect.

When the trial ended, the trial court terminated Mother's parent-

child relationship with Sara. In relevant part, the trial court found in its

order terminating Mother's rights found (1) that Mother engaged in

conduct or knowingly placed Sara with persons who engaged in conduct

which endangered her physical or emotional well-being, and (2) that

Mother failed to comply with the provisions of her court ordered family

service plan.[7] The trial court also found that terminating Mother's

parental rights to Sara is in Sara's best interest.[8] Mother timely

appealed.

---

[7]*See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (O). As previously
mentioned, Father's parental rights to Sara were terminated in the same
order.

[8]*Id.* § 161.001(b)(2).

## Standard of Review

A trial court's findings terminating the parent-child relationship must be supported by clear and convincing evidence.[9] To be clear and convincing, the evidence "must produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[10]

In conducting a legal sufficiency review, we consider the evidence in the light most favorable to the finding, indulging every inference that would support it, while disregarding all evidence a reasonable factfinder could reject.[11] And we sustain the challenge only if the factfinder could not form a firm belief or conviction about the truth of the allegation.[12] In contrast, when reviewing a factual sufficiency challenge, we consider and weigh *all* the evidence, including disputed and conflicting evidence.[13] And we set aside the finding only if "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant

---

[9] *Id.* § 161.001(b).
[10] *Id.* § 101.007; *see also In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005) (cleaned up).
[11] *In re J.F.C.*, 96 S.W.3d at 266.
[12] *Id.*
[13] *In re J.O.A.,* 283 S.W.3d at 345.

that a factfinder could not reasonably have formed a firm belief or conviction" about the truth of the allegation.[14]

In cases tried to the bench, the trial court, acting as the factfinder, decides which witnesses were credible, how to weigh their testimony, and resolves any inconsistencies or conflicts in the testimony.[15] Here, the trial court found Mother endangered Sara, as it relied in part on subsection E to terminate Mother's parent-child relationship in its order. Since proving a parent incurred a subsection E finding in a prior suit to terminate the parent-child relationship of another child would authorize a trial court to terminate a parent's rights to other children in other suits without requiring further proof, we review the trial court's subsection E finding before reaching Mother's argument that the evidence is insufficient to support the trial court's finding that she failed to comply with the requirements of her to court-ordered family service plan.[16] That said, in our review, "[a]ll evidentiary standards, including clear and

---

[14]*J.F.C.*, 96 S.W.3d at 267.

[15]*In the Int. of D.P.*, No. 09-22-00048-CV, 2022 Tex. App. LEXIS 5279, at *24 (Tex. App.—Beaumont July 28, 2022, pet. denied).

[16]*See In the Int. of N.G.*, 577 S.W.3d 230, 235-236 (Tex. 2019) (per curiam).

convincing evidence, recognize the relevance of circumstantial evidence."[17]

## Analysis

In issue one, Mother argues the evidence is legally and factually insufficient to support the trial court's "conduct endangerment" findings. Under subsection E, the Department had the burden to prove, by clear and convincing evidence, that Mother engaged in conduct or knowingly placed Sara with persons who engaged in conduct that endangered her physical or emotional well-being.[18] Under E, the term endanger means "expose to loss or injury; to jeopardize."[19] Generally, a parent who subjects a child to a life of uncertainty and instability has engaged in conduct that endangers their child's physical and emotional well-being.[20] That said, proof of endangerment requires "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment[,]" yet "it is not necessary that the conduct be directed at

[17] *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015).
[18] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E).
[19] *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting "endanger," WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY OF THE ENGLISH LANGUAGE 599 (1976)).
[20] *See In re J.O.A.*, 283 S.W.3d at 345 n.4.

the child or that the child actually suffers an injury."[21] Rather, endangering a child based on a parent's conduct means "to expose a child to loss or injury or to jeopardize a child's emotional or physical health."[22] And the parent's endangering conduct need not occur in the child's presence, so conduct relevant to a factfinder's decision may include conduct the parent directed at another child, whether that conduct occurred before or after the child the subject of the Department suit was born.[23] Generally, from evidence of a parent's past conduct showing the parent subject a child to a life of uncertainty and instability, a factfinder may infer that the parent will continue to engage in the conduct and the same conduct will endanger another child's physical and emotional safety and well-being.[24]

Here, the evidence shows Mother has a decade-long history of abusing illegal substances, substances that range from meth to

---

[21]*Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

[22]*In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

[23]*See J.O.A.*, 283 S.W.3d at 345; *In the Int. of B.P.*, No. 09-22-00031-CV, 2022 Tex. App. LEXIS 4277, at *25 (Tex. App.—Beaumont June 23, 2022, no pet. h.).

[24]*J.O.A.*, 283 S.W.3d at 345 n.4; *In the Int. of D.P.*, 2022 Tex. App. LEXIS 5279, at *25.

marijuana and to synthetic marijuana. To be sure, Mother claimed to have gained control of her addiction in the months leading up to the trial. And to Mother's credit, the drug tests the Department obtained during the pendency of the suit involving Sara were negative. Yet while Mother denied using illegal drugs while pregnant with Sara, the record contains evidence to the contrary. Specifically, based on the history Mother gave to Dr. Meier, Mother dated her sobriety as beginning on May 28, 2020. Dr. Amin relied on that report to infer that Mother had used drugs for a short period after she became pregnant.[25] As the factfinder in the trial, the trial court had the right to "believe one witness and disbelieve others" in resolving the conflicts in the testimony.[26]

To be sure, regardless of Mother's use of drugs during Sara's pregnancy, Mother in her own words described her past use of drugs as a "very bad addiction." Mother acknowledged she only recently became aware of the seriousness of how her addiction was affecting her ability to parent a child, explaining Virginia Manning opened her eyes to the

---

[25]The evidence before the trial court shows Sara was born when she was 30-weeks old, so there is an eight-day period after Mother became pregnant during which the trial court could have inferred that Mother was using her drug of choice, synthetic marijuana.

[26]*McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

seriousness of her problem in counseling despite the evidence she has seen health-care professionals for drug-related problems who have told her to take her addiction seriously since at least 2015.

In deciding whether Mother engaged in a deliberate course of conduct that endangered Sara, the trial court was not required to ignore Mother's decade-long history of using drugs. As the factfinder, the trial court was not required to believe Mother's testimony suggesting she has recently gained control over her addiction. Instead, from the evidence admitted in the trial, the trial court could reasonably form a firm belief or conviction that Mother's underlying mental health issues and her addiction with illegal drugs created a condition that endangered Sara if the court returned Sara to Mother's care. And it was reasonable for the trial court to infer that the stress and anxiety underlying Mother's addiction would be aggravated should Mother be faced with the added stress and financial burden of raising a child. Given the relatively short duration of Mother's claim of sobriety when compared to Mother's history of drug abuse, her admitted addiction, and the lack of evidence that Mother successfully completed a drug rehabilitation program, the trial court could have reasonably formed a firm belief or conviction that

Mother's use of illegal substances was a condition that endangered Sara and that it justified granting the Department's request to terminate Mother's parental rights.[27]

We conclude the evidence allowed the trial court, acting reasonably, to form a firm conviction or belief that Mother's drug addiction creates a condition that endangers Sara's physical and emotional well-being.[28] We overrule Mother's first issue.[29]

*Best-Interest Finding*

In issue three, Mother argues the evidence admitted in the trial is legally and factually insufficient to support the trial court's best-interest finding.[30] With respect to the child's best interest, there is a "strong presumption that the best interest of a child is served by keeping the

---

[27]*See In re J.O.A.* 283 S.W.3d at 346; *In the Int. of J.O.*, No. 09-16-00485-CV, 2017 Tex. App. LEXIS 5011, at *5-6 (Tex. App.—Beaumont June 1, 2017, pet. denied) (mem. op.).

[28]*Id.*

[29]Because we have found the evidence sufficient to support the subsection E finding, we need not address Mother's second issue, which challenges the trial court's finding that Mother failed to comply with the requirements of her court-ordered, family service plan. *See* Tex. R. App. P. 47.1.

[30]Tex. Fam. Code Ann. § 161.001(b)(2).

26

child with the parent."[31] But it is equally presumed that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest."[32] In reviewing a trial court's best-interest finding, we consider the nine non-exhaustive factors identified in *Holley v. Adams*.[33]

In a best-interest analysis, courts focus on the best interest of the child, not the best interest of the parent.[34] Often, the evidence supporting the grounds the Department relied on to terminate a parent's rights under section 161.001(b)(1) is also evidence that may support a trial

---

[31]*In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *see* Tex. Fam. Code Ann. § 153.131(b).

[32]Tex. Fam. Code Ann. § 263.307(a).

[33]In *Holley*, the Texas Supreme Court applied these factors when reviewing a best-interest finding:
- the child's desires;
- the child's emotional and physical needs, now and in the future;
- the emotional and physical danger to the child, now and in the future;
- the parenting abilities of the parties seeking custody;
- the programs available to assist the parties seeking custody;
- the plans for the child by the parties seeking custody;
- the stability of the home or the proposed placement;
- the parent's acts or omissions that reveal the existing parent-child relationship is improper; and
- any excuse for the parent's acts or omission

*Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

[34]*Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

court's best-interest finding.[35] Thus, the Department need not necessarily present evidence on each *Holley* factor, and the absence of evidence on one or more factors does not prevent the factfinder from forming a strong conviction that terminating the parent-child relationship is in the child's best interest, particularly when the evidence shows the parent engaged in conduct that endangered the child.[36]

The trial court heard testimony that Sara is thriving in her foster home. She has foster parents who are meeting her physical and her emotional needs. The foster parents testified they want to adopt Sara. The Department's witnesses, the CASA, and the foster parents' testimony all supports the trial court's finding that terminating Mother's parental rights is in Sara's best interest since terminating Mother's relationship offers Sara a prompt and permanent placement in a safe home with parents capable of taking care of her needs.

Mother asked the trial court to return Sara to her on a monitored basis as an option to terminating her parental rights. Mother testified she is sober, no longer has a boyfriend since she and Father split up, is

---

[35]*In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013).
[36]*In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

28

planning to divorce Father, and is capable of providing Sara with a safe and stable home. Mother also testified that when she was working, her grandmother could help her with Sara, should she need assistance. Yet the grandmother didn't testify in the trial, so Mother was essentially asking the trial court to take her word for it that the grandmother was both willing and capable of helping her raise a child. On the other hand, Mother admitted she didn't know the names of the doctors who were treating Sara for the variety of medical issues that are related to Sara's being born premature. The trial court also heard testimony that Mother has delayed getting surgery care for a medical problem of her own and testimony questioning whether Mother would take Sara to the various out-of-town health-care providers she currently sees.

A parent's past conduct is relevant to a trial court's decision about what is in a child's best interest.[37] As already discussed, the trial court heard evidence that Mother had drug abuse and mental health issues that continued even after she gave up her first three children and was counseled about the seriousness of her addiction. Given Mother's historical use of illegal drugs when compared to the length of time Mother

_____

[37]*Id.* at 27-28.

29

admitted she gained the awareness that her problem was serious, the trial court could reasonably infer that even if now in temporary remission Mother's addiction creates a condition that makes terminating Mother's parental rights so that Sara may be promptly and permanently placed in a safe home where her needs are being met in her best interest.[38] We overrule Mother's third issue.

Conclusion

We conclude that legally and factually sufficient evidence supports the trial court's endangerment and best-interest findings. For the reasons explained above, the trial court's judgment is

AFFIRMED.

_____<br>HOLLIS HORTON<br>Justice

Submitted September 20, 2022
Opinion Delivered November 17, 2022

Before Golemon, C.J., Kreger and Horton, JJ.

---

[38] *In the Int. of J.O.*, 2017 Tex. App. LEXIS 5011, at *9.